# EXHIBIT A

1  ERIC SHEPARD (Ariz. State Bar No. 21323)
   COLORADO RIVER INDIAN TRIBES
2  Office of the Attorney General
   Route 1, Box 23-B
3  Parker, AZ 85344
   Tel. (928) 669-1271
4  Fax. (928) 669-1269

5  ELLISON FOLK (CA State Bar No. 149232)
   WINTER KING (CA State Bar No. 237958)
6  SHUTE, MIHALY & WEINBERGER LLP
   396 Hayes Street
7  San Francisco, CA 94102
   Tel. (415) 552-7272
8  Fax. (415) 552-5816

9  Attorneys for Colorado River Indian Tribes

10

                        **IN THE TRIBAL COURT**
11
                  **OF THE COLORADO INDIAN TRIBES**
12

13

14  COLORADO INDIAN TRIBES            ) Case No.   CV-CO-2007-0100
                                      )
15  Petitioner/Plaintiff             )
                                      )
16                                    )
                                      )
17                                    ) **PETITION FOR EVICTION;**
    vs.                               ) **COMPLAINT FOR DAMAGES IN**
18                                    ) **CONTRACT AND TORT**
                                      )
19                                    )
                                      )
20  WATER WHEEL CAMP RECREATIONAL     )
    AREA, INC., ROBERT JOHNSON, and DOES )
21  1-20,                             )
                                      )
22                                    )
    Respondents/Defendants.          )
23

24  _____   _____

25
    //
26
    //
27
    //
28

Colorado River Indian Tribes ("CRIT" or "Tribe"), for its Complaint against the Defendants, alleges and states as follows:

## THE PARTIES

1.   CRIT is a federally recognized Indian Tribe.  The CRIT Reservation ("Reservation") was established by an Act of Congress in 1865 (Act of March 3, 1865, 13 Stat. 559), and subsequent Executive Orders and Congressional Acts clarified the Reservation's boundaries.

2.   Defendant Water Wheel Camp Recreation Area, Inc. ("Water Wheel" or "Defendant") is a California Corporation.

3.   Upon information and belief, Robert Johnson ("Johnson") is a resident of the State of California and is the owner and/or operator of Water Wheel.

## THE LEASE

4.   On May 15, 1975, CRIT and Water Wheel entered a lease ("Lease") whereby CRIT leased to Water Wheel approximately twenty-six acres of land ("the Property") within the boundaries of the CRIT Reservation.  Title to the Property is held by the United States in trust for CRIT.  The Lease was made and entered into under the Act of April 30, 1964 (78 Stat. 188), as supplemented by Part 131, Leasing and Permitting, of the Code of Federal Regulations, Title 25 – Indians, and any amendments thereto relative to business leases on restricted Indian lands.  A true and correct copy of the Lease is attached hereto as Exhibit A. The terms of the Lease are incorporated by reference into this Complaint.

5.   The Property is located within fractional sections 11 and 14, Township 3 South, and 23 East, San Bernardino Base and Meridian, 29630 Highway 95, Blythe, CA

92225. A legal description of the Property is attached as Exhibit A to the Lease. The Property is approximately 26 acres.

6. The term of the Lease is thirty-two years, beginning on the date the Lease was approved by the United States Secretary of the Interior ("Secretary"). The Secretary approved the Lease on July 7, 1975. Exhibit A at VII. Therefore, the Lease expired on July 6, 2007.

7. Pursuant to Section IV of the Lease, Water Wheel agreed to pay CRIT a minimum annual base rent of $100 per acre per year (or $2,600) for the first twenty-five years of the Lease. Over and above this base rent, Water Wheel was required to pay the following percentages of the gross receipts of businesses conducted on the Property: five percent of sales of alcoholic beverages; four percent of rentals of trailer and camping spaces; two percent of all other income derived from business conducted on the Property. Exhibit A at II-III.

8. The Lease provides that, prior to the beginning of the twenty-sixth year of the Lease, CRIT and Water Wheel "renegotiate the minimum annual rent to the then current fair annual rental value of the leased premises exclusive of improvements." Exhibit A at II.

9. Upon expiration of the Lease, the Lease grants CRIT the option of either (a) keeping all buildings and improvements on the Property, excluding removable personal property and trade fixtures, or (b) requiring Water Wheel to remove them. Exhibit A, Addendum at 6.

10. Under the Lease, Water Wheel is required to obtain the written approval of CRIT, the Secretary, and sureties in order to sublease any part of the Property. Termination

of the Lease for any reason operates as an assignment of all approved subleases to CRIT. Exhibit A, Addendum at 11.

11. The Lease provides that "holding over" by Water Wheel after the termination or expiration of the Lease shall not constitute a renewal or extension of the Lease or give Water Wheel any rights in or to the Property. Water Wheel also agreed to remove all removable property prior to the expiration of the Lease. If Water Wheel fails to remove all removable property at that time, CRIT has the right to remove it and dispose of it or have it stored, all at Water Wheel's expense. Exhibit A, Addendum at 19.

12. Pursuant to the Lease, Water Wheel is required to pay CRIT's reasonable attorneys' fees in any action brought by CRIT to enforce performance of any covenants or conditions of the Lease, or in any unlawful detainer action for rent or any other money due under the Lease. Exhibit A, Addendum at 19.

13. Water Wheel's obligations under the Lease are to the United States as well as to CRIT. Exhibit A, Addendum at 20.

14. Upon expiration of the Lease, Water Wheel was required to deliver up possession of the Property in good condition, peaceably and without legal process. Exhibit A, Addendum at 20.

15. Water Wheel covenanted that it, its employees, agents and sublessees, and their employees and agents, would abide by all laws, regulations, and ordinances of the Colorado River Indian Tribes. Exhibit A, Addendum at 21.

## HISTORY OF RENTAL PAYMENT AND RENEGOTIATION OF ANNUAL RENT

16. The Lease provides that, prior to the beginning of the twenty-sixth year of the Lease, CRIT and Water Wheel were to "renegotiate the minimum annual rent to the then

current fair annual rental value of the leased premises exclusive of improvements." Exhibit A at II. The twenty-sixth year of the Lease commenced on July 7, 2000. In 2000, an appraisal conducted by the Bureau of Indian Affairs ("BIA") determined that the current fair annual rental value of the Property was $130,000. CRIT notified Johnson of this appraisal in or about October 2000.

17.  In or about November 2000, Johnson informed CRIT that he had hired his own appraisal service to appraise the value of the Property. In or about January 2001, Johnson informed CRIT that this private appraiser had determined the fair market value of the Property to be approximately $14,503.58 per year.

18.  In or about August 2001, the BIA reappraised the Property, and concluded that the fair annual rental value was $101,500.

19.  Despite ongoing negotiations among Water Wheel, CRIT, and the BIA, the parties to the Lease never agreed upon a new minimum annual rent for the Property.

20.  Water Wheel paid CRIT the following amounts on the following dates. These amounts are the only payments made by Johnson to CRIT for the Property between July 2000 and July 2007:

      a.  July 7, 2000: $2,600 (base rent for 2000-2001)

      b.  October 5, 2000: $24,001.66 (percentage of gross sales for 1999-2000)

      c.  January 31, 2001: $11,903.58 (additional base rent for 2000-2001)

      d.  January 17, 2001: $9,017.99 (percentage of gross sales for 2000-2001)

      e.  January 19, 2001: $14,503.58 (base rent for 2001-2002)

      f.  August 16, 2002: $14,503.58 (base rent for 2002-2003)

      g.  August 14, 2003: $2,600 (base rent for 2003-2004)

h.  October 10, 2005: $2,600 (base rent for 2004-2005)

21.  Water Wheel did not pay CRIT any percentage of Water Wheel's gross sales proceeds for the last six years of the term of the Lease (i.e., 2001-2, 2002-3, 2003-4, 2004-5, 2005-6, 2006-7).  Water Wheel did not pay CRIT any base rent for the last two years of the term of the Lease (i.e., 2005-6, 2006-7).

**FIRST CAUSE OF ACTION:**
**OCCUPATION OF TRIBAL LAND WITHOUT PERMISSION OR AGREEMENT**
**(CRIT Property Code § 1-101 et seq.)**

22.  Each and every allegation in paragraphs 1-21, inclusive, is incorporated herein by reference.

23.  On or about January 3, 2007, CRIT provided Water Wheel and Johnson with notice that the Lease would expire on July 6, 2007, and a reasonable demand to vacate the Property.  A true and correct copy of that letter is attached hereto as Exhibit B.

24.  The Lease expired on July 6, 2007.

25.  CRIT has not entered into or approved a new lease of the Property with Water Wheel or Johnson.

26.  Water Wheel and Johnson remain on the Property without CRIT's permission or agreement.

**SECOND CAUSE OF ACTION:**
**DECLARATORY RELIEF**

27.  Each and every allegation in paragraphs 1-26, inclusive, is incorporated herein by reference.

28.  An actual controversy exists between CRIT and Water Wheel.  CRIT contends that Water Wheel and Johnson have no authority or permission to be on the

Property, CRIT has requested that they vacate the Property, and yet they remain on the Property. As a result, CRIT has been deprived of the use of its Property. CRIT has also been deprived of: (1) any and all rent from Water Wheel and Johnson since July 7, 2005; (2) adequate rent since July 7, 2000; and (3) the percentage of Water Wheel's gross sales proceeds, to which CRIT is entitled under the Lease, since July 7, 2001.

29. CRIT is entitled to a legal declaration of its rights and Water Wheel's obligations under the Lease and under Tribal law.

### THIRD CAUSE OF ACTION
### BREACH OF LEASE AGREEMENT

30. Each and every allegation in paragraphs 1-29, inclusive, is incorporated herein by reference.

31. Pursuant to the Lease, CRIT was entitled to annual payments of base rent and a percentage of gross sales proceeds from Water Wheel.

32. Water Wheel failed to pay CRIT any base rent for the following years: 2005-6 and 2006-7.

33. Water Wheel failed to pay CRIT any percentage of gross sales proceeds for the following years: 2001-2, 2002-3, 2003-4, 2004-5, 2005-6, and 2006-7.

34. Beginning July 7, 2000, CRIT and Water Wheel were to renegotiate the base rent according to the "current fair annual rental value of the leased premises exclusive of improvements."

35. According to an appraisal by the BIA, the current fair annual rental value of the leased premises exclusive of improvements was $101,500 per year.

36.   Water Wheel paid CRIT substantially less than $101,500 per year for the following years: 2001-2, 2002-3, 2003-4, 2004-5.

37.   CRIT is entitled to all unpaid rent and percentages of gross sales proceeds due and owed under the Lease.

### FOURTH CAUSE OF ACTION
### INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

38.   Each and every allegation in paragraphs 1-37, inclusive, is incorporated herein by reference.

39.   Upon expiration of the Lease, CRIT intended to use the Property for a trailer park resort.  If Water Wheel and Johnson had vacated the Property by July 6, 2007, as required by the Lease, CRIT would have been entitled and able to collect rental payments for the use of the trailers at Water Wheel Resort beginning on July 7, 2007.  Furthermore, if Water Wheel and Johnson had vacated the Property by July 6, 2007, as required by the Lease, CRIT would have been able to pursue other revenue on the Property, including revue from the sale of alcohol and other goods.

40.   CRIT is informed and believes that Water Wheel and Johnson knew that CRIT intended to operate a trailer park resort on the Property after expiration of the Lease.

41.   Despite the knowledge of this business expectancy, Water Wheel and Johnson remained on the Property after the expiration of the Lease.

42.   CRIT is informed and believes that Water Wheel and/or Johnson continued to accept rental payments for the use of the trailers at Water Wheel Resort and continued to sell goods on the Property after the expiration of the Lease.

1
2
3
4

43.  CRIT is informed and believes that Water Wheel and/or Johnson threatened to evict some individuals renting trailers at the Water Wheel Resort if they failed to continue to make rental payments to Water Wheel and/or Johnson after expiration of the Lease.

5
6
7
8
9

44.  Defendants' actions prevented CRIT from taking over management and control of the trailer park resort on the Property, collecting rental payments for the use of the trailers at Water Wheel Resort, and pursuing other revenue on the Property after expiration of the Lease.

10
11
12

45.  CRIT is therefore entitled to damages in the amount of the rental payments for the use of the trailers at Water Wheel Resort and other revenue foregone by CRIT after expiration of the Lease due to Defendants' actions.

13
14

**PRAYER FOR RELIEF**

15
16

WHEREFORE, CRIT respectfully requests that judgment be entered in its favor and against Water Wheel and Johnson jointly and severally as follows:

17
18
19

A.      For a Writ of Restitution ordering the immediate eviction of Water Wheel and Johnson and delivery of the Property, along with all buildings and improvements except removable personal property and trade fixtures, to CRIT;

20
21

B.      For the sum of $661,789.26 in base rent owed by Water Wheel to CRIT under the terms of the Lease;

22
23
24
25

C.      For the percentage of gross sales proceeds owed by Water Wheel to CRIT under the terms of the Lease for years 2001-2, 2002-3, 2003-4, 2004-5, 2005-6, and 2006-7;

26
27

D.      For interest on said base rent and percentage of gross sales proceeds at the rate of ten percent (10%) per annum from the date such rent was first due, until paid;

28

E.      For damages in the amount of $8,458.33 per month for each month

Water Wheel and/or Johnson has remained on the Property after termination of the Lease or, in the alternative, for damages in an amount to be determined at trial for any and all rental payments and other revenue foregone by CRIT due to Defendants' actions during the time Water Wheel and/or Johnson has remained on the Property after termination of the Lease;

   F. For CRIT's taxable costs incurred herein, including its reasonable attorneys' fees;

   G. For interest on said attorneys' fees and taxable costs at the rate of ten percent (10%) per annum from the date of entry of judgment herein, until paid;

   H. For a declaration that the Lease has expired and that Water Wheel and Johnson have no further right, title, and/or interest in the Property; and

   I. For such other and further relief as the Court should deem just and appropriate under the circumstances.

**NOTICE PURSUANT TO LOCAL RULES OF CIVIL PROCEDURE, RULES 6 & 7**

   Defendants Water Wheel and Johnson must respond to this Petition/Complaint by filing a written answer with the Tribal Court within twenty (20) calendar days of delivery on or receipt by Defendants of this Petition/Complaint. Failure to do so will result in a judgment by default against Defendants for the relief demanded in this Petition/Complaint.

Dated: _October 1, 2007_

        SHUTE, MIHALY & WEINBERGER LLP

        By _Winter King by Eric Shepard_

         WINTER KING

        COLORADO RIVER INDIAN TRIBES

        By _Eric Shepard_

         ERIC SHEPARD

[P:\CRIT\WB\Water Wheel\wk002(COMPLAINT with IIPEA COA).doc]

Case No.
PETITION FOR EVICTION; COMPLAINT FOR DAMAGES

9

## CERTIFICATE OF SERVICE

I hereby certify that on October __1__, 2007, the original *Petition for Eviction; Complaint for Damages in Contract and Tort* was personally delivered to the Tribal Court for the Colorado River Indian Tribes for filing to:

**Clerk of the Court – Tribal Court**
Colorado River Indian Reservation
Route 1, Box 23-B
Parker, AZ 85344

I further certify than on October __1__, 2007, I caused to be served, via U.S. Certified Mail, Return Receipt and by personal delivery, one copy of *Petition for Eviction; Complaint for Damages in Contract and Tort* to the following:

Robert Johnson
Water Wheel Camp Recreation, Inc.
29630 Highway 95
Blythe, CA 92225

I declare the above to be true and correct under penalty of perjury.  Executed this _1st_ day of October, 2007, at _Parker, AZ_ .

# EXHIBIT A



LEASE NO.   B-468-CR

LESSEE:  WATER WHEEL CAMP RECREATION AREA, INC.
LESSOR:  COLORADO RIVER INDIAN TRIBES

## INDEX

ARTICLE NO.                                                         PAGE

I           LAND DESCRIPTION                                          :

II          TERM

III         PURPOSE OF THIS LEASE                                    II

IV          RENTALS                                                  II

V           PAYMENT OF RENTS                                        III

VI          IMPROVEMENT AND COMPLETION OF DEVELOPMENT               III

VII         PUBLIC LIABILITY INSURANCE                              ...

VIII        ADDITIONAL PROVISIONS                                    :

IX          VALIDITY                                                 :

## ADDENDUM

1           DEFINITIONS                                               .

2           INDEMNIFICATION                                          2

3           FIRE AND DAMAGE INSURANCE                                2

4           ACCOUNTING AND AUDITS                                    .

5           PLANS AND DESIGNS                                        5

6           IMPROVEMENTS                                             .

7           CONSTRUCTION, MAINTENANCE, REPAIR, ALTERATION            ..

8           NON-RESPONSIBILITY NOTICES                               .

9           RENTAL BOND                                              .

10          PERFORMANCE BOND                                         :

11          COMPANIES   BONDING  AND INSURING                       1:

12          SUBLEASE, ASSIGNMENT, TRANSFER                          1:

13          STATUS OF SUBLEASES                                     ::

14          AGREEMENTS FOR UTILITY FACILITIES                      11

MAY 1975
COLORADO RIVER
AGENCY
PARKER
ARIZ.

ENTERED JUL  1 1975

15   RIGHTS-OF-WAY FOR STREETS AND UTILITY FACILITIES   12

16   ENCUMBRANCE   12

17   LIENS, TAXES, ASSESSMENTS, UTILITY CHARGES   13

18   LESSOR PAYING CLAIMS   14

19   UNLAWFUL USES   14

20   EMINENT DOMAIN   15

21   DEFAULT   16

22   ATTORNEY'S FEES   19

23   HOLDING OVER   19

24   NO PARTNERSHIP   19

25   TERMINATION OF FEDERAL TRUST   19

26   LESSEE'S OBLIGATIONS   20

27   PAYMENTS AND NOTICES   20

28   INSPECTION   20

29   DELIVERY OF PREMISES   20

30   LEASE BINDING   20

31   INTEREST OF MEMBER OF CONGRESS   20

32   TAX IMMUNITY   21

33   FORCE MAJEURE   21

34   RESERVATION LAWS AND ORDINANCES   21

35   WATER USE   21

36   POLLUTION   22

UNITED STATES
DEPARTMENT OF THE INTERIOR
Bureau of Indian Affairs
Colorado River Agency
Parker, Arizona 85344

LEASE NO. __B-468-CR__

CONTRACT NO._____

BUSINESS LEASE

THIS LEASE is made and entered into this ___15th___ day of
__MAY__ , ~~19__~~, by and between THE COLORADO RIVER INDIAN TRIBES, herein-
after called the "Lessor," whose address is Route 1, Box 23-B, Parker, Arizona
85344, and WATER WHEEL CAMP RECREATION AREA, INC., a California Corporation,
hereinafter called the "Lessee," whose address is Box 2900, Parker Star Rt.,
Blythe, California 91225, under the provisions of the Act of April 30, 1964
(78 Stat. 188), as supplemented by Part 131, Leasing and Permitting, of the
Code of Federal Regulations, Title 25 - Indians, and any amendments thereto
relative to business leases on restricted Indian lands, all of which by
reference are made a part hereof.

1. LAND DESCRIPTION

For and in consideration of the rents and agreements hereinafter set
out, the Lessor hereby leases to the Lessee the following described premises:

Land within fractional sections 11 and 14, Township 3 South,
and 23 East, San Bernardino meridian.  See exhibit "A",
legal description attached hereto.

All of the above land being located in Riverside County, State
of California, containing twenty-six (26) acres, more or less,
and subject to any prior, valid, existing rights-of-way for
State highways or public utilities.

II.   TERM

The term of this lease shall be thirty-two (32) years beginning on the date this lease is approved by the Secretary.

III.   PURPOSE OF THIS LEASE

The conduct of a recreational facility and all purposes incidental thereto, including, but not limited to, a recreational center, a convenience store, a bar, a recreational trailer park, the rental of trailer and camping spaces, the operation of a marina and facilities related thereto, and homesites for employees.  If the Lessee uses the leased premises for any purpose not set forth above, such use shall constitute grounds for cancellation of the lease.

IV.   RENTALS

The Lessee, in consideration of the foregoing, agrees to pay in lawful money of the United States of America to the Bureau of Indian Affairs, Colorado River Agency rentals as follows:

A.   The following guaranteed minimum annual rentals:  the sum of One Hundred Dollars ($100.00) per acre per year for the first through the twenty-fifth year of the lease.  Prior to the beginning of the twenty-sixth year, Lessee and Lessor shall renegotiate the minimum annual rent to the then current fair annual rental value of the leased premises exclusive of improvements.  Said fair annual rental to be estimated by normal appraisal procedures and methods.  Said guaranteed minimum annual rentals shall be paid in advance, the first payment to be deposited with the Superintendent when this lease is submitted for approval, and subsequent payments to be made to the Bureau of Indian Affairs, Colorado River Agency on or before each anniversary date of the approval of this lease by the Secretary.

B.   As additional rentals over and above guaranteed minimum annual rentals, the following percentages of gross receipts of businesses, as specified below, regardless of whether such businesses are operated by Lessee, Sublessee, Assignee, or Concessionaires:

(1)  Sales of alcoholic beverages          5%

(2)  Rentals of trailer and camping spaces  4%

(3)  All other income derived from business

conducted on the premises          2%

If any part or parts of the leased premises are used for any purpose or purposes other than those set out above, the right to use the premises for such purposes and the percentage rentals to be paid for such uses shall be negotiated by the Lessor and the Lessee, subject to the approval of the Secretary, prior to the time such uses are commenced.

Lessee agrees that, at all times during the term of this lease, it will diligently attempt to keep the leased premises and all parts thereof actively used.

All businesses on the leased premises shall be conducted during the regular and customary hours of such businesses and on all business days in good faith, so that Lessor will at all times receive the maximum income under the percentage rental provisions of this lease.

V.  PAYMENT OF RENTS

All rents shall be paid without prior notice or demand.  Past due rental shall bear interest at ten percent (10%) per annum from the due date until paid, but this provision shall not be construed to relieve the Lessee from his obligation to make timely rental payments.

VI.  IMPROVEMENTS AND COMPLETION OF DEVELOPMENT

The Lessee agrees that within the times specified below the Lessee will have completed construction of the following buildings and improvements in accordance with the completion of construction schedule set forth below:

(1)  Remove the existing structure.

(2)  Install spaces for a minimum of 100 trailers.

III

(3)   Create and improve at least 100 camping spaces.

(4)   Dig and install a well and modern water distri-
bution system.

(5)   Install modern sewer hookups and electrical
distribution systems.

(6)   Construct modern restroom-shower-laundry facility
buildings and fully equip them.

(7)   Construct modern recreational-snack barstore
structures.

(8)   Construct a concrete boat launching facility
suitable for moderate use.

(9)   Landscape and provide improved roadways upon
the premises.

All improvements recited above shall be completed prior to the end
of the sixth year of this lease.

If the Lessee fails to complete improvement, development and
construction within each such period, the Lessor may at his sole option as to
each such period:

A.   Require that the guaranteed minimum annual rentals payable
under this lease increase ten percent (10%) at the beginning of the next
lease year of this lease, and for each lease year thereafter that the Lessee
fails to complete such full improvement, development and construction, the
guaranteed minimum annual rentals payable under this lease shall be increased
additionally two percent (2%) of the previous year's rent.

VII.   PUBLIC LIABILITY INSURANCE

At all times during the term of this lease, Lessee shall carry a
public liability insurance policy with coverages of not less than ONE HUNDRED
THOUSAND DOLLARS ($100,000) / THREE HUNDRED THOUSAND DOLLARS ($300,000) for
personal injury and FIFTY THOUSAND DOLLARS ($50,000) for property damage, said
policy to be written jointly to protect Lessee and Lessor.  Evidence, accept-
able to the Secretary, of such coverage shall be furnished to the Secretary.

IV.

VIII.   ADDITIONAL PROVISIONS

The provisions of the attached Addendum to Lease containing Articles, 1 through 36, are hereby incorporated herein and made a part hereof.

IX.   VALIDITY

This lease, and any modification of or amendment thereto, shall not be valid or binding upon either party hereto until approved by the Secretary.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands.

LESSOR:
COLORADO RIVER TRIBES

Attest:

By: _Herman D. Laffoon Sr._          By: _Anthony Drennan Sr._
Secretary, Tribal Council              Chairman, Tribal Council

LESSEE:
WATER WHEEL CAMP RECREATION AREA, INC.

Attest:

By: _____          By: _____
Secretary                          President

ACKNOWLEDGMENT OF LESSOR

State of Arizona  )
                  )  ss:
County of Yuma    )

ON THIS ___1st___ day of ___JULY___, 19_75_, before me, the Undersigned Notary Public, personally appeared ___ANTHONY DRENNAN, SR.___ _____ and ___HERMAN D. LAFFOON, SR,___ _____, to me known to be the identical persons who executed the within and foregoing instrument and acknowledged to me that they executed the same in their official capacity as Chairman and Secretary, respectively, of the

1  Colorado River Tribal Council, as the free and voluntary act of said Community

2  for the uses and purposes therein set forth.

3          IN WITNESS WHEREOF, I have hereunto set my hand and offical seal.

4

5                                          _____
                                                    Notary Public

6  My Commission Expires: ___MAY 19, 1978___

7

8

9                          ACKNOWLEDGMENT OF LESSEE
                                   (CORPORATE)

10

11  STATE OF ~~CALIFORNIA~~ ARIZONA )

12  COUNTY OF ~~RIVERSIDE~~ Yuma    ) ss:

13

14          ON THIS 17th day of June , 19 75 , before me, the

15  undersigned Notary Public, personally appeared: _____

16  Bert T Denham     and     Barbara Denham

17  _____, known to me to be the  President and Secretary,

18  respectively, of the corporation that executed the within lease and acknowledged

19  that they, as such officers being authorized to do so, executed the foregoing

20  lease for the uses and purposes therein contained as the free and voluntary act

21  of said corporation.

22          IN WITNESS WHEREOF, I have hereunto set my hand and offical seal.

23

24

25                                          _____
                                                      Notary

26  My Commission Expires: June 13, 1978

27

28

29

30

31                              VI

32

UNITED STATES
DEPARTMENT OF THE INTERIOR
Bureau of Indian Affairs
Colorado River Agency

THE WITHIN LEASE is hereby approved pursuant to authority delegated
from the Secretary of the Interior to the Commissioner of Indian Affairs in
Order 2508 (10 BIAM 2), redelegated to the Phoenix Area Director by 10 BIAM 3,
and further redelegated to the Superintendent of the Colorado River Reservation
by 10 BIAM 11.

Title:   Superintendent

Date of Approval: __7-7-15____

LEASE NO. _ B-468-CR _____

CONTRACT NO._____

ADDENDUM

The following articles 1 through 36 constitute a part of the above numbered lease.

1. DEFINITIONS

A.  "Secretary" means the Secretary of the Interior or his authorized representative.

B.  "Gross receipts" means all income, including money and any other thing of value, received by or paid to Lessee or its affiliates, whether individuals, corporations, partnerships, or other legal entity, or received by or paid to others for Lessee's or its affiliate's use and benefit, or received by sublessee, asignee or concessionaire, derived from business done, sales made, or services rendered directly or indirectly from or on the leased premises, or derived from the subleasing, sub-renting, permitting, contracting, or other use of the leased premises, or any portion thereof.  All income accruing from credit transactions shall be treated as "gross receipts" as of the date credit is extended.  "Gross receipts" shall include any ad valorem taxes paid by other than the lessee for the account of the lessee.

"Gross receipts" shall not include:  (1) amounts collected and paid out for a sales or excise tax imposed by a governmental authority where such tax is billed to the purchaser as a separate item: (2) credits for the exchange of goods or merchandise between the stores, if any, of Lessee or its affiliates where such exchange is made solely for the convenient operation of business and not for the purpose of consummating a sale previously made directly or indirectly from or on the leased premises: (3) the amount of any refund where the merchandise sold, or some part thereof, is returned by the purchaser and accepted by Lessee and its affiliates; and (4) income from the sale of fixtures, or goodwill, or the sale of improvements constructed by the Lessee on the leased premises primarily for its won use.

1

C.  "Approved encumbrance" herein shall mean an encumbrance approved by the Secretary, the Lessor, and sureties, if any, in the manner provided herein.  "Encumbrancer" herein shall mean the owner and holder of an approved encumbrance.

D.  "Superintendent" means the Superintendent, or other officer in charge of the Colorado River Agency, Bureau of Indian Affairs.

2.  INDEMNIFICATION

Neither the Lessor nor the United States, nor their officers, agents and employees shall be liable for any loss, damage or injury of any kind whatsoever to the person or property of the Lessee or Sublessees or any other person whomsoever, caused by any use of the leased premises, or by any defect in any structure erected thereon, or arising from any accident, fire or other casualty on said premises or from any other cause whatsoever. Lessee hereby waives all claims against Lessor and the United States and agrees to hold Lessor and the United States free and harmless from liability for any loss, damage or injury arising from the use of the premises by Lessee, together with all costs and expenses in connection therewith.

3.  FIRE AND DAMAGE INSURANCE

Lessee shall, from the date of approval of this lease, carry fire insurance with extended coverage endorsements, to include vandalism, jointly in the names of the Lessee and Lessor, covering the full insurable value of all permanent improvements on the leased premises.  Evidence, acceptable to the Secretary, of such coverage shall be furnished to the Secretary.

Lessee shall pay all premiums and other charges for such insurance and shall deposit with the Secretary the receipt for each premium or other charges as paid, or satisfactory evidence thereof.  In the event of damage to any improvement on the leased premises, the Lessee shall reconstruct the improvement in compliance with applicable laws and building regulations and in

2

accordance with plans to be approved pursuant to Article 5, "Plans and Designs", hereof.  Such reconstruction shall  commence within one (1) year after the damage occurs and shall be pursued diligently.  Insurance proceeds shall be deposited in escrow with an institution approved by the Secretary. The Lessee shall also deposit in said escrow all additional funds required to reconstruct the damage improvement.  Escrow instructions shall include provisions that all funds so deposited shall be used to reconstruct the damaged improvements, and funds shall be disbursed during the progress of recontruction on proper architect's, engineer's or contractor's certificates.

If Lessee has not defaulted under this lease, all money in escrow after reconstruction has been completed shall be paid to Lessee.  If a default has taken place, said money shall remain in escrow as security for performance by Lessee until said default is corrected, after which funds remaining shall be paid to Lesssee.  If lessee does not correct the default, said funds shall be paid to the Lessor.

An encumbrancer may be named as a beneficiary under the insurance mentioned herein, and in the event of loss or damage to the buildings on the leased property while an approved encumbrance remains unpaid, the proceeds of such insurance (but not exceeding the amount of the approved encumbrance) shall be paid to the encumbrancer.  If such amount paid to the encumbrancer is sufficient to repair the loss or damage with respect to which it was paid, or if insufficient to repair the loss or damage, and Lessor or Lessee shall within three (3) months after such payment by the insurer to the encumbrancer deposit with the encumbrancer enough money to completely repair the loss or damage, when added to the amount paid by the insurer to the encumbrancer, the encum- brancer shall, upon written order of Lessor and Lessee, pay such monies for such repair, and it shall not be deemed a payment or credit on the encumbrance. However, if, prior to the expiration of such three (3) month period, the

3

Lessor or Lessee shall not so deposit money with the encumbrancer, the said

sum so paid by the insurer to the encumbrancer shall be applied and credited

upon the approved encumbrance.  Such application and credit, however, will in

no way relieve the Lessee of the obligation to reconstruct improvements on the

leased premises.

4.  ACCOUNTINGS AND AUDITS

        The Lessee shall, not later than thirty (30) days after the end of

each fiscal year of this lease, submit to the Lessor and the Secretary certified

audit reports of gross receipts.  With said audit reports, Lessee shall tender

payment of any difference between the guaranteed minimum annual rental and the

amount due under the rental provisions of this lease.  Each audit report shall

be accompanied by an opinion, which may be qualified according to customary

accounting procedures, and both shall be prepared and verified by a Certified

Public Accountant, licensed in the State of California in conformity with

standard accounting procedures.  Any duly authorized representative of the

United States, or any qualified accounting agent or agents appointed by the

Lessor, shall have access to and the right to examine and audit any or all

pertinent books, documents, papers and records, including State and Federal

Income and Sales Tax returns, of the Lessee and Lessee's tenants relating to

this lease during the normal business hours of any working day.  Lessee shall

insert a similar provision in all subleases pertaining to this right of access,

examination and audit and shall make available to said representative, agent or

agents all books and records of Lessee's tenants which may be requested or may

be necessary for completion of a special audit of any or all business conducted

under the provisions of this lease.

        In the event the Lessor should cause a special audit of the Lessee's

pertinent books, documents, papers and records by a Certified Public

Accountant, licensed in the State of California, and if such audit reveals that

the Lessor has been paid less than 98 percent (98%) of the amount to which

4.

Lessor is entitled for any reporting period covered by the audit, then the expense of such audit shall be borne by the Lessee, otherwise it will be borne by the Lessor. Upon approval by the Secretary, or his authorized representative, the audit so performed shall be binding upon both the Lessee and Lessor.

Lessor or the Secretary shall be entitled at any time within four (4) years after the receipt of any such precentage rental payment to question the sufficiency of the amount thereof and/or the accuracy of the audit report or reports furnished by Lessee to justify the same, and shall have the right to examine and/or audit as hereinbefore described. Lessee shall for said period keep safe and intact all of Lessee's records, books, accounts and other data which in any way bear upon or are required to justify in detail any such report and Lessee shall insert a provision in all subleases requiring similar retention of records.

5. PLANS AND DESIGNS

Within One Hundred and Eighty (180) days after the approval of this lease, the Lessee shall submit to the Lessor and the Secretary for approval a general plan and design for the complete development of the entire leased premises. Before beginning any construction whatsoever on the leased premises, the Lessee shall submit to the Secretary and the Lessor comprehensive plans and specifications for the improvements then proposed which have been approved by the State of California and Riverside County. The Lessor and the Secretary shall not assume any responsibility whatever for detailed design of structure or structures or violation of any State, County or City law or ordinance.

6. IMPROVEMENTS

All buildings and improvements, excluding removable personal property and trade fixtures, on the leased property shall at the option of Lessor remain on said property after the termination of this lease and shall

5

1  thereupon become the property of the Lessor.  The term, "removable personal

2  property," as used in this Article shall not include property which normally

3  would be attached or affixed to the buildings, improvements or land in such

4  a way that it would become a part of the realty, regardless of whether such

5  property is in fact so placed in or on or affixed to the buildings, improve-

6  ments or land in such a way as to legally retain the characteristics of

7  personal property.

8          The Lessor shall have the right to require Lessee to remove any or

9  all of the buildings or improvements on the leased premises at the termination

10  of the lease by written notification to Lessee within ninety (90) days after such

11  termination.  Lessee at Lessee's sole cost and expense shall remove said

12  buildings or improvements within six (6) months thereafter and restore the

13  affected premises as nearly  as possible to the condition existing at the

14  time this lease commenced.

15          Lessee expressly waives all provisions of State and local law

16  pertaining to improvements affixed to the land by any person acting in good

17  faith and erroneously believing, because of a mistake either of law or fact,

18  that he has a right to do so, and also providing for removal of such

19  improvements.

20  7.  CONSTRUCTION, MAINTENANCE, REPAIR, ALTERATION

21          All improvements placed on the leased premises shall be constructed

22  in a good and workmanlike manner and in compliance with applicable laws and

23  building codes.  All parts of buildings exposed to perimeter properties

24  shall present a pleasant appearance and all service areas shall be screened

25  from public view.  The Lessee shall have the right at any time during the

26  term of this lease to make limited alterations, additions or repairs to any

27  improvement on the premises in an amount not to exceed Ten Thousand Dollars

28  ($10,000.00).  Removal or demolition of any improvements or alterations,

29

30

31

32

1  additions or repairs to any improvements in excess of the above amount

2  shall not be made without the prior written consent of the Lessor and the

3  Secretary.  The Lessee shall, at all times during the term of this lease and

4  at the Lessee's sole cost and expense, maintain the premises and all improve-

5  ments thereon in good order and repair and in a neat, sanitary and attractive

6  condition and in compliance with applicable laws, ordinances, or regulations.

7  8.  NON-RESPONSIBILITY NOTICES

8          Prior to the commencement or construction of each improvement on

9  the leased property, or any repair or alteration thereto, the Lessee shall

10  give the Secretary ten (10) days advance notice in writing of intention to

11  begin said activity, in order that non-responsibility notices may be posted

12  and recorded as may be provided by State and local laws.  Lessor hereby

13  authorizes the Secretary to post said notices on Lessor's behalf.  Nothing

14  contained in this lease shall be construed as a waiver of immunity of trust

15  or restricted property from mechanics' or materialmen's liens or obligate

16  the Secretary or Lessor to post non-responsibility notices while the leased

17  premises are in a trust or restricted status.

18

19  9.  RENTAL BOND

20          Within one hundred fifty (150) days from date of approval of this

21  lease by the Secretary, the Lessee shall post a bond satisfactory to the

22  Secretary in a penal sum of not less than the second year's minimum rent,

23  which bond shall be deposited with the Secretary.  The said bond shall be

24  maintained at all times in an amount not less than the sum of the minimum

25  rental payments to become due and payable during the ensuing twelve (12)

26  calendar months of the lease, unless and until the requirement for such bond

27  is waived by the Secretary.  Should waiver of rent bond be granted, the

28  Secretary may later reinstate the requirement for a bond and Lessee hereby

29

30

31                                    7

32

1  agrees to comply with said requirement.  Lessee may furnish a corporate

2  surety bond, or in lieu thereof, may deposit with the Secretary cash or

3  negotiable United States Treasury Bonds or other negotiable Treasury

4  obligations in the appropriate amount, together with power of attorney,

5  empowering the Secretary, in the event of lessee's default in any of the

6  rent provisions of this lease, to pay over any such cash, or to dispose

7  of any such bonds and pay over the proceeds derived therefrom, to or for

8  the benefit of the Lessor, subject to Lessee's privilege of curing said

9  default as hereinafter provided.  Any other type of security which may be

10 offered by Lessee to satisfy the requirements of this Article will be

11 given reasonable consideration by the Secretary, but it is agreed that

12 acceptance of bond in lieu of those described above shall be at the sole

13 discretion of the Secretary.

14        It is agreed that bond required by this provision will guarantee

15 payment of rent only and that corporate surety bond shall be in continuous

16 form and may be subject to the provision that the surety may terminate said

17 effective bond 30 days subsequent to the then next ensuing anniversary date

18 of this lease by giving at least forty-five (45) days' written notice to

19 the Secretary.  If U.S. Treasury Bonds are provided, Lessee agrees to make

20 up any deficiency in the value deposited that might occur due to a decrease

21 in the value of the bonds.  Interest on said bonds shall be paid to Lessee.

22 10.  PERFORMANCE BOND

23        Before beginning construction of each improvement, Lessee agrees

24 to provide security to guarantee completion of the improvements and payment

25 in full of claims of all persons for work performed on or materials furnished

26 for construction.  Lessee may provide said security by either:

27        A.  Posting a corporate surety bond in an amount equal to the cost

28 of each  building or other improvement, said bond to be deposited with the

29

30

31                                    8

32

Secretary and to remain in effect until the improvement is satisfactorily
completed.  Said bond shall be conditioned upon the faithful performance of
Lessee, and give all claimants the right of action to recover upon said bond
in any suit brought to foreclose mechanics' or materialmen's liens against
the property; or

B.    Depositing in escrow with an institution acceptable to the
Secretary, negotiable United States Treasury Bonds or cash, in an amount
sufficient to pay the entire cost of construction of each building or
other improvement then to be erected on the premises.  The escrow instructions
shall include provisions for disbursement in installments upon certification
of Lessee's architect as construction progresses.  The Lessor and Secretary
shall have access to all information relative to the disbursement of funds
through said escrow.  The escrow instructions shall also provide:  that not
less than fifteen percent (15%) of such funds shall be withheld by the escrow
holder until the period fixed by law for the filing of all mechanics' or
materialmen's liens on such improvement shall have expired or until an
acceptable title company issues a title insurance policy which in substance
insures the Lessor and Secretary against any loss they shall sustain by reason
of any statutory liens for labor or material arising out of any work or
improvement described in said escrow instructions; that if mechanics' or
materialmen's liens are filed, the funds so withheld shall then be used to
discharge such liens; and that if no such liens are filed within the statutory
period for filing, the withheld funds shall be then disbursed to the Lessee.
If U.S. Treasury Bonds are provided, Lessee agrees to make up any deficiency
in the value deposited which might occur due to a decrease in the value of
the bonds.   Interest on said bonds shall be paid to the Lessee; or

C.    Entering into a building loan agreement with a financial
institution, which building loan agreement and the amount of the equity of

9

1  the Lessee in the improvements upon effecting the loan, shall be subject
2  to the approval of the Secretary.
3  11.   COMPANIES BONDING AND INSURING
4        All corporate surety bonds provided by Lessee in compliance with
5  this lease shall be furnished by companies holding certificates of authority
6  from the Secretary of the Treasury as acceptable sureties on Federal bonds.
7  Insurance policies shall be furnished and maintained by such responsible
8  companies as are rated A-Plus, AAA, or better in the current edition of
9  Best's Insurance Guide.
10 12.   SUBLEASE, ASSIGNMENT, TRANSFER
11       A.   Sublease
12            The Lessee shall not, unless otherwise expressly authorized here-
13 in, sublease all or any part of the leased premises or the improvements on
14 the leased premises, without the written approval of the Lessor, the Secretary,
15 and sureties.  No such sublease shall be valid or binding without said approval,
16 and then only upon the condition that sublessee has agreed in writing that,
17 in the event of conflict between the provisions of this lease and of his
18 sublease, the provisions of this lease shall govern.  Any sublease made except
19 as aforesaid shall be deemed a breach of this lease.
20            The Secretary and the Lessor shall either approve or state their
21 reasons for disapproval of a sublease within thirty (30) days after the sublease
22 is submitted for approval.
23            The renting of trailer or camping spaces for a period less than twelve
24 months shall not constitute subleasing.
25            Prior to offering trailer or camping spaces for sublease, Lessee shall
26 submit for approval of the Secretary and the Lessor schedules of minimum annual
27 rents for same.  Such schedules shall be subject to periodic review at the request
28 of the Secretary and the Lessor.  Rents for trailer or camping spaces, that have
29
30
31                                        10
32

1  not been subleased may be adjusted with the written consent and approval of the

2  Lessee, Lessor, and the Secretary.

3      B. Assignment or Transfer

4          The Lessee shall not assign or transfer all or any part of his

5  interest in this lease without the written approval of the Lessor, the Secretary

6  and sureties; provided, that the requirements for approvals of any assignment

7  or transfer necessary for the Lessee or any sublessee to secure an encumbrance

8  on a leasehold interest shall be governed by the provisions of Article 16.

9  ENCUMBRANCE.  No such assignment or transfer shall be valid or binding

10  without said approval, and then only upon the condition that assignee or other

11  successor in interest, excepting an approved encumbrancer under conditions

12  herein set forth, shall agree in writing to be bound by each and all of the

13  covenants and conditions of this lease.  Any such assignment or transfer,

14  except as aforesaid, shall be deemed a breach of this lease, excepting that an

15  encumbrancer, as herein set forth, may enforce his rights in the manner here-

16  inafter provided.  The Secretary and Lessor shall either approve or state their

17  reasons for disapproval of any assignment or transfer within thirty (30) days

18  after it is submitted for approval.  A transfer of interest by inheritance is

19  not a transfer of interest as meant by this lease.

20  13.  STATUS OF SUBLEASES

21          Termination of this lease, by cancellation or otherwise, shall not

22  serve to cancel approved subleases and/or subtenancies, but shall operate as an

23  assignment to Lessor of any and all such subleases and/or subtenancies.

24  14.  AGREEMENTS FOR UTILITY FACILITIES

25          Lessee shall have the right to enter into agreements with public

26  utility companies and the State of California or any of its political subdivisions

27  to provide utility services, including gas, water, electricity, telephone,

28  television and sewer facilities, necessary to the full enjoyment of the leased

29

30

31                       11

32

premises and the development thereof in accordance with the provisions of this lease, which agreement shall be binding upon any sublessees or other occupant of the leased premises; provided, that no such agreement shall be for a period longer than the term of this lease or cover land not included in this lease. Upon entering into such agreement or agreements, the Lessee shall furnish to the Secretary and the Lessor executed copies thereof together with a plat or diagram showing the true location of the utility lines to be constructed in accordance therewith.

15. RIGHTS-OF-WAY FOR STREETS AND UTILITY FACILITIES

Lessor hereby consents to the granting of rights-of-way for streets and utility facilities necessary to the full enjoyment of the leased premises and development thereof. Such rights-of-way are to be granted by the Secretary in accordance with the approved general development plan and pursuant to the Act of February 5, 1948 (62 Stat. 17), and any amendments thereto, as supplemented by regulations of the Secretary applicable thereto.

16. ENCUMBRANCE

This lease, or any right to or interest in, or any of the improvements on the leased premises may be encumbered only with the written approval of the Lessor, the Secretary and sureties, and no such encumbrance shall be valid without said approval. The leasehold may be encumbered only for the purpose of borrowing capital for the development and improvement of the leased premises. An encumbrance must be confined to the leasehold interest of Lessee and shall not jeopardize in any way the Lessor's interest in the land. Lessee agrees to furnish as requested any financial statements or analyses pertinent to the encumbrance that the Secretary may deem necessary to justify the amount, purposes, and terms of said encumbrance.

In the event of default by the Lessee of the terms of an approved encumbrance, the encumbrancer may exercise any rights provided in such approved

12

1   encumbrance, provided that before any sale of the leasehold, whether under

2   power of sale or foreclosure, the encumbrancer shall give to the Secretary and

3   Lessor notice of the same character and duration as is required to be given to

4   Lessee by such encumbrance and/or the laws of the State of California.

5         If any sale under the approved encumbrance occurs, whether by power

6   of sale or foreclosure, the purchaser at such sale shall succeed to all of the

7   rights, title and interest of the Lessee in the leasehold estate covered by

8   said approved encumbrance.  It is further agreed that, if the purchaser at such

9   sale is the encumbrancer, the encumbrancer may sell and assign the leasehold

10  interest without any further consent, provided that the assignee shall agree

11  in writing to be bound by all the terms and conditions of this lease.  If the

12  encumbrancer is the purchaser, it shall be required to perform this lease only

13  so long as it retains title thereto.  If a sale under the approved encumbrance

14  occurs and the purchaser is a party other than the encumbrancer, said purchaser

15  as successor in interest to the Lessee, shall be bound by all the terms and

16  conditions of this lease.

17        If such notice of such sale shall be given and the defaults or any of

18  them upon which such notice of sale is based shall then continue, Lessor shall

19  have the right to correct such defaults at any time prior to the date of sale

20  or foreclosure, and to terminate such leasehold upon paying to the encumbrancer

21  the amount of principal and accrued interest which remain unpaid.

22  17.   LIENS, TAXES, ASSESSMENTS, UTILITY CHARGES

23        Lessee shall not permit to be enforced against the leased premises,

24  or any part thereof, any liens arising from any work performed, materials fur-

25  nished, or obligations incurred by Lessee, and Lessee shall discharge or post

26  bond against all such liens before any action is brought to enforce same.

27  Lessee shall pay, when and as the same become due and payable, all taxes,

28  assessments, licenses, fees and other like charges levied during the term of

29

30                                      13

31

32

this lease upon or against the leased land, all interest therein and property thereon for which either the Lessee or Lessor may become liable.  Upon written request, the Lessee shall furnish to the Secretary written evidence, duly certified, that any and all taxes required to be paid by Lessee have been paid, satisfied, or otherwise discharged.  Lessee shall have the right to contest any claim, tax, or assessment against the property by posting bond to prevent enforcement of any lien resulting therefrom, and Lessee agrees to protect and hold harmless the Lessor, the Secretary and the leased premises and all interest therein and improvements thereon from any and all claims, taxes, assessments, and like charges and from any lien therefor or sale or other proceedings to enforce payment thereof, and all costs in connection therewith.  Lessor shall execute and file any appropriate documents with reference to real estate tax exemption of the land when requested by Lessee.  In addition to the rents, taxes, and other charges herein described, Lessee shall pay all charges for water, sewage, gas, electricity, telephone and other utility services supplied to said premises as they become due.

18.  LESSOR'S PAYING CLAIMS

Lessor shall have the option to pay any lien or charge payable by Lessee under this lease, or settle any action therefor, if the Lessee, after written notice from Lessor or Secretary, fails to pay or to post bond against enforcement.  All costs and other expenses incurred by Lessor in so doing shall be paid to Lessor by Lessee upon demand, with interest from date of payment until repaid at the rate of two percent (2%) over the then prevailing prime interest rate but not to exceed 12%.  Failure to make such repayment on demand shall constitute a breach of the covenants of this lease.

19.  UNLAWFUL USE

The Lessee agrees not to use or cause to be used any part of the leased premises for any unlawful conduct or purpose.

14

20.  EMINENT DOMAIN

A.  Definition of terms, Lessee's option.  The term, "total taking,"
as used in this Article means the taking of the entire leased land in fee under
the power of eminent domain.  The term, "partial taking," means any other
taking in fee under the power of eminent domain, except that if one-quarter or
more by area but not all of the leased land is so taken, or the amount of land
taken substantially reduces the ability of Lessee to conduct a business or make
use of the premises as herein authorized, the Lessee shall have the option
within sixty (60) days of the date of such taking by notice in writing to
Lessor and the Secretary and with the consent of all holders of approved
encumbrances to have such taking deemed a "total taking."

B.  Total taking.  In case of total taking, the leasehold estate
of Lessee and his liability for future installments of rental (except accrued
percentage rental, if any) shall cease and terminate as of the date the actual
physical possession of the premises shall be so taken.

C.  Partial taking.  In case of partial taking this Lease shall
terminate as to the portion taken upon the date on which actual possession of
said portion is taken, but this Lease shall continue in full force and effect as
to the remainder of the leased land; and each ensuing installment of ground
rental only shall be abated in the ratio that the value of the leased land taken
bears to the total value of the leased premises prior to such taking.

D.  Refund of advance rentals.  There shall be no refund of ground
rent paid in advance, because of total or partial taking of the leased premises.

E.  Allocation of award.  All compensation and damages awarded for the
taking of the leased land and/or the improvements or any portion thereof shall,
except as otherwise herein provided, belong to and be the sole property of
Lessor, and Lessee shall not have any claim or be entitled to any award for
diminution in value of its leasehold hereunder or for the value of any unexpired
term of this Lease; provided, however, that Lessee shall be entitled to a
portion of the award equal to:

15.

(1)  In case of partial taking, the reasonable cost of alterations modifications and repairs necessary to place the remaining portion of the leased land in suitable condition for continuance of Lessee's tenancy;

(2)  In case of either total or partial taking, the enhancement in value of the parcel taken by reason of Lessee's improvements diminished by a fraction of which the total years of the economic life of the improvements is the denominator and the number of full years elapsed since the beginning of the lease term is the numerator;

and Provided further, that in case of either total or partial taking, each holder of an approved encumbrance on the leasehold or the portion of the premises taken, shall be entitled before either Lessor or Lessee, to so much of the award for the taking of improvements only as is equal to the delinquent and/or non-delinquent unpaid balance of the obligation secured by such mortgage and accrued delinquent and/or non-delinquent interest as of the date of such taking.

F.  <u>Taking for a term</u>.  In case the leased premises or any portion of them are condemned for a term of years, then Lessee shall remain bound by all rental provisions of this Lease and shall be entitled to the entire award except such part, if any, as is allowable to a period beyond the term of this Lease.

G.  <u>Voluntary conveyance</u>.  A voluntary conveyance by Lessor to a public utility, agency or authority under threat of a taking under the power of eminent domain in lieu of formal proceedings shall be deemed a taking within the meaning of this Article.

21.  DEFAULT

Time is of the essence of this lease.  Should Lessee default in any payment of monies or fail to post bond, as required by the terms of this lease, and if such default shall continue uncured for the period of Fifteen (15) days after written notice thereof by the Secretary to Lessee, or should Lessee breach any other covenant of this lease, and if the breach of such other covenant shall

16

continue uncured for a period of sixty (60) days after written notice thereof by the Secretary to Lessee, then the Secretary may either:

    A.  Proceed by suit or otherwise to enforce collection or to enforce any other provision of this lease; or

    B.  Re-enter the premises and remove all persons and property there-from, excluding the persons and property belonging to authorized sublessees, and either:

    (1)  Re-let the premises without terminating this lease, as the agent and for the account of Lessee, but without prejudice to the right to terminate the lease thereafter, and without invalidating any right of Lessor and the Secretary or any obligation of Lessee hereunder.  Terms and conditions of such re-letting shall be at the discretion of Lessor and the Secretary, who shall have the right to alter and repair the premises as they deem advisable and to re-let with or without any equipment or fixtures situated thereon.  If a sufficient sum is not thus realized to liquidate the total amount due, including attorney's fees and real estate commissions paid, Lessee shall pay to Lessor monthly, when due, any deficiency, and Lessor or the Secretary may sue thereafter as each monthly deficiency shall arise.

    (2)  Terminate this lease at any time even though Lessor and the Secretary have exercised rights as outlined in (1) above.

    Any action taken or suffered by Lessee as a debtor under any insolvency or bankruptcy act shall constitute a breach of this lease.  In such event the Lessor and the Secretary shall have the options set forth in sub-Articles A and B above.

    At least forty-five days (45) prior to termination of this lease for default by the Lessee, the Lessor or the Secretary shall give notice to all approved encumbrancers expressing the intention to terminate and describing said default or breach.  When the default or breach can be cured by the payment or expenditure of money, this lease will not be terminated if within forty-five (45)

17

1  days after receipt of such written notice to terminate the encumbrancer shall
2  cure the default or breach.  Whenever the encumbrancer exercises any right on
3  a default situation, the encumbrancer shall be bound to comply with all of the
4  obligations and conditions of the lease.  When the default or breach cannot be
5  cured by the payment or expenditure of money, this lease will not be terminated
6  if the encumbrancer shall within the said forty-five (45) day period initiate,
7  and thereafter diligently pursue to completion, proceedings for foreclosure
8  and sale under and pursuant to the terms of the encumbrance.  However, during
9  and until the completion of such foreclosure proceedings, the encumbrancer shall
10 pay the rents due and payable by the Lessee under this lease; shall maintain all
11 insurance as required by the lease; shall pay all taxes due and unpaid on the
12 taxable property covered by the lease; shall begin the cure of any other default
13 or breach not curable by payment or expenditure of money which can reasonably be
14 undertaken by the encumbrancer; and shall diligently prosecute the said cure of
15 such default or breach until the leasehold is either sold upon foreclosure
16 pursuant to the terms of the encumbrance or released or reconveyed thereunder.

17        In case a default or breach on the part of the Lessee occurs preceding,
18 during, or due to the bankruptcy, receivership, or insolvency of Lessee, and
19 the encumbrancer, prior to the receipt of the notice of intent to terminate
20 described herein or within forty-five (45) days after the receipt thereof,
21 shall have filed in the court having jurisdiction over such bankruptcy,
22 receivership or insolvency, a petition for permission to foreclose, the
23 filing of such petition shall be deemed to be the beginning of foreclosure
24 proceedings for the purposes of this Article.  The bankruptcy, receivership,
25 or insolvency of Lessee shall be considered a breach which cannot reasonably
26 be cured by encumbrancer and one not curable by the payment of money.

27        No waiver of a breach of any of the covenants of this lease shall be
28 construed to be a waiver of any succeeding breach of the same or any other
29 covenant.

30

31                                        18

32

22.  ATTORNEY'S FEES

     If action be brought by Lessor in unlawful detainer for rent or any sums of money due under this lease, or to enforce performance of any of the covenants and conditions of this lease, and Lessor prevails in said action, the Lessee shall pay reasonable attorneys fees to Lessor, to be fixed by the court as a part of the costs in any such action.

23.  HOLDING OVER

     Holding over by the Lessee after the termination or expiration of this lease shall not constitute a renewal or extension thereof or give the Lessee any rights hereunder or in or to the leased premises.

     Lessee agrees to remove all property removable under the terms of this lease prior to the termination or expiration of this lease; provided, however, that if this lease is terminated prior to the expiration date, Lessee shall have thirty (30) days after the termination date to remove all such property.  Should the Lessee fail to remove any such property within the specified time, Lessor shall have the right to remove it and dispose of it or have it stored all at Lessee's expense.

24.  NO PARTNERSHIP

     Regardless of the fact that terms of rental are in part on a percentage basis, Lessee and Lessor are not in partnership.

25.  TERMINATION OF FEDERAL TRUST

     Nothing contained in this lease shall operate to delay or prevent a termination of Federal trust responsibilities with respect to the land by the issuance of a fee patent or otherwise during the term of this lease; however, such termination shall not serve to abrogate this lease.  The owners of the land and the Lessee and his surety or sureties and encumbrancer or encumbrancers shall be notified of any such change in the status of the land.

19.

26.  LESSEE'S OBLIGATIONS

While the leased premises are held in trust by the United States or subject to a restriction against alienation imposed by the United States, all of the Lessee's obligations under this lease, and the obligations of Lessee's sureties, are to the United States as well as to the owner of the land.

27.  PAYMENTS AND NOTICES

All notices, payments and demands shall be sent to the parties hereto at the addresses herein recited or to such addresses as the parties may hereafter designate in writing.  Notices and demands shall be delivered in person or sent by registered or certified mail.  Service of any notice or demand shall be deemed completed ten (10) days after mailing or on the date actually received, whichever occurs first.  Copies of all notices and demands shall be sent to the Superintendent.

28.  INSPECTION

The Secretary and the Lessor and their authorized representatives shall have the right, at any reasonable times during the term of this lease, to enter upon the leased premises, or any part thereof, to inspect the same and all buildings and other improvements erected and placed thereon.

29.  DELIVERY OF PREMISES

At the termination or expiration of this lease, Lessee will peaceably and without legal process deliver up the possession of the leased premises, in good condition, usual wear and acts of God excepted.

30.  LEASE BINDING

This lease and the covenants, conditions and restrictions hereof shall extend to and be binding upon the successors, heirs, assigns, executors, and administrators of the parties hereto.

31.  INTEREST OF MEMBER OF CONGRESS

No member of, or delegate to, Congress, or Resident Commissioner, shall be admitted to any share or part of this contract or to any benefit that

29

may arise herefrom, but this provision shall not be contrued to extend to this contract if made with a corporation or company for its general benefit.

32.  TAX IMMUNITY

Nothing contained in this lease shall be deemed to constitute a waiver of applicable laws providing tax immunity to trust or restricted Indian property or any interest therein or income therefrom.

33.  FORCE MAJEURE

Whenever under this instrument a time is stated within which or by which original construction, repairs, or reconstruction of said improvements shall be completed, and if during such period a general or sympathetic strike or lockout, war or rebellion, or some other event occurs beyond Lessee's power to control, the period of delay so caused shall be added to the period allowed herein for the completion of such work.

34.  RESERVATION LAWS AND ORDINANCES

The Lessee, Lessee's employees, agents and sublessees and their employees and agents agree to abide by all laws, regulations, and ordinances of the Colorado River Tribes now in force and effect, or that may be hereafter in force and effect; provided, that no such future laws, regulations or ordinances shall have the effect of changing or altering the express provisions and conditions of this lease unless  consented to in writing by the Lessee.

35.  WATER USE

The Lessee is hereby permitted during the term of this lease to obtain from and use water from the Colorado River, for beneficial purposes only, by pumping directly from the river or from wells an amount not to exceed seventy-eight (78) acre-feet of water per year.

In connection with the diversion of water by any means from the mainstream of the Colorado River chargeable to Lessor's rights, Lessee shall, if required by any notice from Lessor, give the Superintendent advance notice of its daily water requirements for each period of seven (7) consecutive days

beginning Monday of each week.  Such notice shall be given not later than the
Wednesday preceding such Monday to the official of the Bureau of Indian Affairs
designated for that purpose by Lessor and shall be in the form prescribed by
the Bureau of Indian Affairs.  Lessee shall not divert more water than the
quantity specified in such notice without prior approval of the Bureau of
Indian Affairs.

        To facilitate the accounting of the diversions, returns, and bene-
ficial consumptive uses by the Secretary of the Interior of the waters of the
mainstream of the Colorado River in accordance with the Decree of the Supreme
Court in Arizona v. California (376 U.S. 340 (1964)), the Lessee shall, if
required by notice from Lessor, maintain accurate and complete records of the
sources and amounts of water used on the leased area, shall furnish such records
to Lessor on request and shall install metering or measuring devices as may be
called for by the Secretary of the Interior or his authorized representative.

        Water is to be used only for those purposes set forth in article III
of this lease and purposes reasonably incidental thereto and shall not be used
or sold off the leased premises.  Water used by Lessee for any other purpose
shall result in immediate cancellation of this lease.

36.  POLLUTION

        (A)  In its use of the leased premises, Lessee shall not discharge,
dispose of or permit the escape of water, sewage, sewage effluent, waste of any
kind or materials of any kind either separately or in combination in any place
or manner which might result in contamination or pollution of any surface or
underground stream or flow of water or body of water either  within or outside
of the leased premises.

        (B)  Lessee shall promptly install and diligently operate such
facilities as may be necessary to control the storage or disposition of water,
sewage, sewage effluent, waste of any kind and other materials in order to comply
with the provisions of subarticle (A) above.

(C)  Lessee shall promptly take all such reasonable precautions including the installation of such control facilities as may be directed by Superintendent, provided, that nothing contained in this subarticle shall relieve the Lessee of its obligations under subarticles 36(A), (B) and (D) hereof without further notice from Superintendent.

(D)  In addition to the obligations to comply with the provisions of subparagraphs (A) and (B) above, Lessee shall comply with all applicable water pollution control laws and regulations under Federal or State jurisdiction now or hereafter in force.

23

LEASE NO.  B-468-CR

EXHIBIT "A"
LEGAL DESCRIPTION

Starting at the meander corner between Sec. 11 & 14, T3S,R23E,SBM, of the
dependent resurvey of 1958, thence S52°03'E., a distance of 575.52' to a
point known as AP #3, thence N38°13'E., a distance of 519' to Point No. 1,
the true point of beginning, an iron pipe in a concrete footing, thence
S8°53'W., a distance of 414' to Point No. 2, a power pole on the hillside,
thence S43°35'W., a distance of 380' to Point No. 3, a point on the inter-
section of the Highway 95 right-of-way, thence S30°33'E., a distance of
345' following the highway right-of-way to Point No. 4, thence S17°16'E.,
a distance of 343' following the highway right-of-way to Point No. 5, a
10" spike, thence N82°56'E., 1069' along a dirt road to Point No. 6, a
faucet protruding 6" above the ground, thence N9°49'E., a distance of 74'
to Point No. 7, a 1½" pipe driven flush in the ground at a fence point
corner, thence N82°01'E., a distance of 379' to Point No. 8, a 10" spike
marked with a lath and flagging, thence N62°57'W., a distance of 310' to
Point No. 9, a fence corner, thence N60°00'W., 560' to Point No. 10, a
½" rebar protruding 2" above the ground, thence N29°02'E., a distance of
377' along the fence line to Point No. 11 on the right bank of the Colorado
River, thence northwesterly along the right bank of the Colorado River to
Point No. 1, the point of beginning containing 26 acres, more or less.

ORDINANCE NO. _____

ORDINANCE GRANTING TO SAN DIEGO GAS & ELECTRIC COMPANY,
ITS SUCCESSORS AND ASSIGNS, THE FRANCHISE TO INSTALL,
MAINTAIN AND USE PIPES AND APPURTENANCES FOR TRANSMITTING
AND DISTRIBUTING GAS FOR ANY AND ALL PURPOSES UNDER, ALONG,
ACROSS OR UPON THE PUBLIC STREETS AND PLACES AS THE SAME
NOW OR MAY HEREAFTER EXIST WITHIN THE CITY OF CARLSBAD

The City Council of the City of Carlsbad does ordain
as follows:

Section 1. Whenever in this ordinance the words or
phrases hereinafter in this section defined are used, they shall
have the respective meanings assigned to them in the following
definitions (unless, in the given instance, the context wherein
they are used shall clearly import a different meaning):

(a) The word "grantee" shall mean San Diego Gas & Electric Company,
and its lawful successors or assigns;

(b) The word "city" shall mean the City of Carlsbad, a municipal
corporation of the State of California, in its present incor-
porated form or in any later reorganized, consolidated, en-
larged or reincorporated form;

(c) The word "streets" shall mean the public streets, ways, alleys
and places as the same now or may hereafter exist within said
city, including state highways, now or hereafter established
within said city, and freeways hereafter established within
said city.

(d) The word "gas" shall mean natural or artificial gas, or a mix-
ture of natural and artificial gas;

(e) The phrase "pipes and appurtenances" shall mean pipes, pipe-
lines, mains, services, traps, vents, vaults, manholes, meters,
gauges, regulators, valves, conduits, appliances, attachments,
appurtenances and any other property located or to be located
in, upon, along, across, under or over the streets of the city,
and used or useful in the transmitting and/or distributing of
gas;

grantee, and failure by said grantee to file such veri-
fied statement, or to pay said percentage at the time and in the
manner specified, shall be grounds for the declaration of a for-

(7) The phrase "install, maintain and use" shall mean to lay,
construct, erect, install, operate, maintain, use, repair
or replace.

Section 2. The franchise to install, maintain and use
in the streets of said city all pipes and appurtenances for trans-
mitting and distributing gas to the public for any and all purposes
within said city is hereby granted to San Diego Gas & Electric Com-
pany, its successors and assigns.

Section 3. Said franchise shall be indeterminate,
that is to say, said franchise shall endure in full force and ef-
fect until the same shall, with the consent of the Public Utili-
ties Commission of the State of California, be voluntarily surren-
dered or abandoned by the grantee, or until the state or some
municipal or public corporation thereunto duly authorized by law
shall purchase by voluntary agreement or shall condemn and take
under the power of eminent domain, all property actually used and
useful in the exercise of said franchise and situate in the terri-
torial limits of the state, municipal or public corporation pur-
chasing or condemning such property, or until said franchise shall
be forfeited for non-compliance with its terms by the grantee.

Section 4. The grantee of said franchise shall during
the term thereof pay to said city two per cent of the gross annual
receipts of said grantee arising from the use, operation or pos-
session of said franchise; provided, however, that such payment
shall in no event be less than one per cent of the gross annual
receipts of grantee derived from the sale of gas within the limits
of said city.

Section 5. The grantee shall file with the Clerk of
said city, within three months after the expiration of the cal-
endar year, or fractional calendar year, following the date of
the granting hereof, and within three months after the expiration
of each and every calendar year thereafter, a duly verified state-

-2-

said Council held on the __5th__ day of __May__ , 19__53__ , by
the following vote:

        AYES:    Councilmen Graham, Centerena , Acting Mayor Ede

        NOES:    Councilmen None

        ABSENT:  Councilmen Sutton, Mayor McClellan

                  Raymond C. Ede
                Acting  Mayor of the
                   City of Carlsbad

ATTEST:

Edward G. Hughes
Clerk of the City of Carlsbad

# EXHIBIT B



# COLORADO RIVER INDIAN TRIBES

## *Realty Services*

ROUTE 1, BOX 23-B
PARKER, ARIZONA 85344
(928) 669-6800 • FAX (928) 669-6762

January 3, 2007

Robert Johnson
Water Wheel Camp Recreation, Inc.
29630 Highway 95
Blythe, CA  92225

Re:  Lease No. B-468-CR

Dear Mr. Johnson:

This is to advise you that your Lease No. B-468-CR expires July 6, 2007.  In accordance
with the ADDENDUM to the Lease, Article 29. DELIVERY OF PREMISES, states: *"At
the termination or expiration of this lease, Lessee will peaceably and without legal
process deliver up the possession of the leased premises, in good condition, usual wear
and acts of God excepted."*

If you have any questions, please call me at 928-669-6800.

Sincerely yours,

Herman Laffoon, Jr.
Commercial Manager

cc:  Goldie Stroup, Real Estate Services, BIA, CRA
     Eric Shepard, Attorney General

COLORADO RIVER INDIAN TRIBES
OFFICE OF THE ATTORNEY GENERAL
RECEIVED
2007 APR 25  AM 11: 16

## CERTIFICATE OF SERVICE

I hereby certify that on September ____, 2007, the original *Petition for Eviction;*

*Complaint for Damages in Contract and Tort* was personally delivered to the Tribal Court

for the Colorado River Indian Tribes for filing to:

**Clerk of the Court – Tribal Court**
Colorado River Indian Reservation
Route 1, Box 23-B
Parker, AZ 85344

I further certify than on September ____, 2007, I caused to be served, via U.S.

Certified Mail, Return Receipt and by personal delivery, one copy of *Petition for Eviction;*

*Complaint for Damages in Contract and Tort* to the following:

Robert Johnson
Water Wheel Camp Recreation, Inc.
29630 Highway 95
Blythe, CA 92225

I declare the above to be true and correct under penalty of perjury.  Executed this ___

day of September, 2007, at _____.

_____